OMAHA PACKING CO. v. PITTSBURGH, F. W. & C. RY. CO. et al.

No. 7352.

Circuit Court of Appeals, Seventh Circuit.

April 8, 1941.

John S. Lord, C. H. G. Heinfelden, Austin V. Clifford, and Theodore C. Diller, all of Chicago, Ill., for appellant.

Frank J. Loesch, Ed. M. Burke, D. L. Dickson, Silas H. Strawn, John D. Black, and Harold A. Smith, all of Chicago, Ill., for appellees.

Before SPARKS and MAJOR, Circuit Judges, and BALTZELL, District Judge.

MAJOR, Circuit Judge.

This is an appeal from a judgment in favor of the defendants, in an action to recover damages sustained by plaintiff's meat packing plant and contents thereof, by a fire which occurred on August 4, 1932, and which spread to plaintiff's plant from the nearby Quincy Grain Elevator as the alleged result of a thirty-minute delay at defendants' drawbridge of a fireboat of the City of Chicago, proceeding to the fire.

The case was tried to a jury upon a complaint containing eight counts which were substantially alike except the allegations as to defendants' negligence. Each of the counts contained a history of defendants' drawbridge over the South branch of the Chicago River at Stewart Avenue, which, at that point, is a navigable river wholly within Illinois; the connection of each defendant with the bridge; the location and description of plaintiff's packing plant and the Quincy Elevator; the fire in the elevator on August 4, 1932; the delay of the fireboat for thirty minutes on its way to the fire, occasioned by the failure of defendants' bridge to rise; the spread of the fire to plaintiff's plant during the delay; the ability of the fireboat, if it had not been delayed at the bridge, to have prevented the fire reaching the plaintiff's plant, and the nature of plaintiff's damages, resulting from the delay, in the amount of $750,000.

Counts 1 and 2 were based upon defendants' breach of duty imposed by ordinance (§ 2859) requiring drawbridges to be opened for fireboats "as soon as practicable" and an ordinance (§ 2880) requiring railroad bridges over the Chicago River and its branches to be opened "immediately" for passing vessels unless a train was on the bridge or approaching it so closely as to be unable to stop. Count 3 was based upon negligence in the management of the bridge and equipment for opening the same; count 4, negligence in failing to have proper and dependable equipment and means for raising and lowering said bridge so that the same could be promptly opened to permit the said fireboat to pass on to the place of said fire; count 5, negligence by failure to inspect, maintain and keep in repair the equipment for raising and lowering the bridge so that the same could be promptly opened; count 6, negligence in the employment and use of incompetent and unskilled agents and servants to control and operate the equipment and means for raising and lowering the bridge; count 7, negligence in failing to have the bridge equipped with proper and dependable emergency equipment and means for raising and lowering the bridge, and count 8, with a violation of a Federal statutory provision contained in § 494, Title 33 U.S.C.A.

The contested issues are: (1) Whether Congress, by the enactment of § 494, Title 33 U.S.C.A., so preempted the field of regulating bridges on navigable waters that City Ordinances of the City of Chicago regulating drawbridges within its limits were invalid, (2) whether evidence relative to the character of structures on the banks of the river was admissible as bearing on the attention, vigilance and exertion which the defendants were required to exercise in order to amount to due care under the circumstances, (3) whether the doctrine of res ipsa loquitur was applicable to the failure of a drawbridge to rise on proper signal, (4) if so, whether proof of the physical cause of the defendants' failure to raise the bridge deprives plaintiff of the benefit of such doctrine, (5) whether plaintiff, under count 8 of the complaint, was entitled to an instruction informing the jury that, from proof of the failure of the bridge to rise on proper signal, plaintiff made out a prima facie case of negligence which placed upon the defendants the burden of going forward with evidence to show they were not negligent, and (6) certain portions of the court's charge which, it is claimed, improperly minimized the standard of care imposed upon the defendants.

The trial of the case lasted almost six weeks, during which time 107 witnesses testified for the plaintiff, and 47 for the defendants. The testimony had largely to do with three questions: (1) Were the defendants negligent in failing for half an hour to raise their drawbridge for the fireboat? (2) Was such alleged negligence the proximate cause of the damage to plaintiff's plant, i. e., could the fireboat have saved the plaintiff's plant if it had not been delayed? and (3) The extent of plaintiff's damages.

It is apparent, we think, from a reading of the contested issues, that there is no occasion to go into any detail concerning the mass of testimony as it concerns questions (2) and (3). This testimony has to do with the extent and magnitude of the fire, the time it started in the Quincy Elevator and spread to plaintiff's plant, the time of arrival of the numerous fire companies, the effort made by such companies to subdue and prevent the spreading of the fire, the reasons why the land equipment was not capable of controlling the fire, the time of arrival of the fireboat (Graeme Stewart), and the time it would have arrived had it not been delayed by the failure of the drawbridge to rise, and its capacity and ability as a fire-fighting unit, together with the probable results which it might have obtained, in preventing the spread of the fire from the grain elevator to plaintiff's plant. There is also much testimony relative to the extent of the damage sustained by plaintiff to its plant, equipment and products. This testimony being immaterial to the issues raised on this appeal, we need not give it further consideration.

The controversy revolves largely around the alleged negligence of the defendants in the maintenance and operation of the drawbridge, and it therefore seems pertinent to make a statement of the facts as they pertain to that feature of the case.

Plaintiff's plant was situated on the north bank of the South Branch of the Chicago River just west of Halsted Street. Immediately west of the plant was the Quincy Elevator where the fire originated. The defendants' bridge crossed this river at Stewart Avenue, approximately 12,000 feet south of the Franklin Street bridge, and some 4,000 feet northeast of the west end of plaintiff's plant. The bridge, which is of the vertical lift type, was equipped so that the 200 foot span over the river could be lifted straight up to a height of 111 feet. Over this bridge were the two main line tracks of the Pennsylvania and Alton Railroads, running north to the Chicago Union Station, and over which passenger trains traveled approximately every half hour. It does not seem material to relate the detailed and, to us, complicated mechanism by which the bridge was raised and lowered. Briefly, it was operated by electric power by a leverman employed by defendants, stationed in a cabin or "shanty" just off the bridge at the southeast corner. Seven levers were employed in the mechanical operation of raising and lowering the bridge. When these levers were thrown into normal position by the leverman, he would ring a bell twice and the bridge operator, in his cabin on the movable span, would then raise the bridge.

At the time in controversy, lever No. 3 failed to function. We do not think it is important to go into detail concerning the particular function performed by this lever or its connection with the other levers, essential to the operation of the bridge. It is sufficient to relate, we think, that certain parts of its mechanism were connected by a round brass pin extending through openings in such parts. This pin was about two inches long and one-eighth of an inch in diameter, and projected a short distance beyond the connected parts. There was a small hole at each end of this pin into which a cotter key was inserted. The pin fit loosely and it was the function of the cotter keys to hold it in its proper connecting position. It is not disputed—in fact was so proven by the plaintiff—that failure of the bridge to raise was occasioned by the absence or loss of a cotter key which permitted the pin to fall from its normal position, resulting in a disconnection of the parts, and thereby rendering ineffective, lever No. 3. The mechanism controlling the No. 3 lever was in a steel covered box locked with a padlock and a wire seal lock. The box could be opened either with a key or by breaking the seal.

The fireboat, Graeme Stewart, responding to an alarm, left its station at the foot of Franklin Street and made a perfect run up the river until it came to defendants' bridge at Stewart Avenue. It arrived at the bridge about 3:45 P. M. where it was delayed for around thirty minutes, occasioned by the failure of the bridge to

rise. Upon replacement of the brass pin, the mechanism was in operative condition and the bridge raised.

We shall now consider the errors relied upon by the plaintiff as embraced in the contested issues stated heretofore. It is contended that the Trial Court erred in refusing to admit in evidence two ordinances of the City of Chicago, upon which counts 1 and 2 of the complaint were predicated, and in directing a verdict for the defendants with respect to those counts. One of these ordinances provides: " * * * whenever a fireboat shall approach a bridge and sound the proper signal for such bridge to open, the bridge tender shall, if such bridge is closed, open the same as soon as practicable * * *," § 2859 and the other provides: "When any vessel shall signal for any railroad bridge across the Chicago River or any of its branches the bridge tender shall immediately open the bridge. * * *" § 2880.

The action of the Trial Court was evidently upon the theory that Congress had preempted the field by enactment of Section 494, Title 33 U.S.C.A., which, in part, provides: " * * * if the bridge shall be constructed with a draw, then the draw shall be opened promptly by the persons owning or operating such bridge upon reasonable signal for the passage of boats and other water craft. * * *"

In other words, it appears to have been the theory that the city ordinances could prescribe no duty with respect to the bridge, binding upon the defendants.

It is plaintiff's contention that the Act of Congress did not preempt the field and that the exclusion of these ordinances and direction of verdict was prejudicial. The defendants contend to the contrary and that, in any event, the action of the court could not have been prejudicial to the plaintiff for the reason that the ordinances impose no higher or greater responsibility upon the defendants than that required by the Federal provision upon which count 8 of the complaint was predicated. In other words, the issue presented by counts 1 and 2 could have been no more favorable to the plaintiff than that presented by count 8 which was submitted to the jury. Plaintiff relies largely upon Escanaba Co. v. Chicago, 107 U.S. 678, 2 S.Ct. 185, 27 L. Ed. 442. In that case, it is true, the court upheld the power to regulate by ordinance the use of the South Branch of the Chicago River and the bridges crossing it. It must be noted, however, that such holding was predicated upon the absence of Federal regulation. On page 683 of 107 U.S., at page 189 of 2 S.Ct., 27 L.Ed. 442, the court said: " * * * If the power of the state and that of the federal government come in conflict, the latter must control and the former yield. * * * But until congress acts on the subject, the power of the state over bridges across its navigable streams is plenary. * * *"

The defendants, in support of their contention, rely upon a decision of this court —City of Milwaukee v. American S. S. Co., 7 Cir., 76 F.2d 343, in which it was held that regulations relative to the opening and closing of drawbridges, promulgated by the Secretary of War in conformity with power delegated by Congress, precluded the City of Milwaukee from imposing municipal regulations upon the same subject. Plaintiff seeks to distinguish this case by pointing out that in the instant case no such regulations have been promulgated by the Secretary of War respecting drawbridges over the Chicago River. We do not think this is a valid distinction for the reason that in the instant situation, Congress has not merely delegated authority to the Secretary of War, but has itself provided that such bridges "shall be opened promptly." If the ordinances, one of which provides that such bridges shall open "as soon as practicable" and the other which requires "shall immediately open the bridge," impose a higher duty upon the defendants than that imposed by the Statute, then they are in conflict therewith and invalid. On the other hand, if they are in conformity with the statute, imposing no higher duty, it is difficult to see how plaintiff was in any manner prejudiced by the action of the court. The Trial Judge, in commenting upon this situation, on motion for new trial, said:

"I do not think the elimination of counts one and two made any difference at all. Those ordinances, I do not think, cast any greater duty on the defendants, even if valid, than they were already under, and the Court told the jury they were under the Federal Act in question, so I think the plaintiffs had a trial on that issue."

We are of the opinion that the court properly excluded the ordinances and directed a verdict upon the counts based thereon. Furthermore, if this conclusion

be erroneous, we are of the opinion that plaintiff was not prejudiced for the reason, as pointed out by the Trial Court, that it had a trial upon the issue presented by count 8 of the complaint, which differed in no material respect from that presented by counts 1 and 2.

■ It is next contended that the Court erred in excluding testimony relative to the character of property on the banks of the South Branch of the Chicago River west of the Stewart Avenue Bridge. The Trial Court thought this testimony immaterial. Plaintiff argues that such testimony was relevant as bearing upon the question of ordinary care under the circumstances. It is claimed that if the banks of the river west of the bridge were lined with industrial plants similar to plaintiff's, that a greater amount of vigilance and exertion would be necessary, in order to constitute ordinary care, than if the banks of the river were meadows where only grass fires might occur. We are not confronted, however, with such a situation. In the first place, there was introduced in evidence certain exhibits and photographs which disclosed numerous buildings in the neighborhood of plaintiff's property. In the next place, the Quincy Elevator, where the fire originated, and plaintiff's plant, were structures of considerable magnitude. The Elevator was 288 feet long, 106 feet wide and 142 feet high. Plaintiff's property included extensive enclosures for livestock, loading chutes, a three-story building, a four-story building, as well as numerous warehouses and other buildings. These various buildings were, of course, described in detail and it is difficult to perceive how ordinary care on the part of the defendants would have required any greater or different vigilance to keep the bridge functioning under a situation sought to be shown by the rejected testimony.

Under plaintiff's theory, every time an additional packing plant or elevator was constructed, the hazard from fire would be increased and, consequently, the degree of care imposed upon the defendants would also be increased. We do not believe this position is sound. In any event, we are of the opinion that the exclusion of such testimony could have resulted in no material harm to plaintiff's cause.

The most important question raised on this appeal has to do with the doctrine of res ipsa loquitur (sometimes hereinafter referred to as the "doctrine"). The argument relative thereto may be divided into three parts: (1) Was the doctrine applicable to the failure of the drawbridge to rise on proper signal, (2) if so, did proof by the plaintiff of the precise cause of the defendants' failure to raise the bridge deprive plaintiff of the benefit of the doctrine, and (3) if plaintiff was entitled to the benefit of the doctrine, was the instruction offered by it, purporting to be predicated upon the doctrine, sufficient for that purpose? In other words, was it error on the part of the Trial Court to deny the instruction purporting to define the doctrine?

Little, if any, consideration need be given to the first proposition. In fact, we do not understand that defendants seriously contend but that the doctrine would, or, at any rate might, be applicable if plaintiff's proof had been confined merely to the failure of the bridge to rise. Even if that proposition were controverted, however, we are of the opinion, in view of the issues presented, that is not necessary for decision. Therefore, for the purpose of decision, we assume, without deciding, that there might have been a situation wherein the doctrine would have been applicable. That brings us to the second proposition around which the controversy largely revolves, concerning which a decision must be made. There is no occasion to further relate the facts and circumstances showing the reason for the failure of the bridge to rise, inasmuch as that reason not only was proved by the plaintiff, but in its brief, is conceded in the following statement:

"Plaintiff's evidence showed that the physical cause of the failure of the bridge to rise was the fact that a cotter pin had come out of one end of a bronze wrist pin. The latter had to be in its proper place in order for the interlocking control machinery to permit the bridge to rise. The absence of the cotter pin had permitted the bronze wrist pin to slip out of place. When an employee of another railroad replaced the bronze pin the bridge lifted. The control equipment in question was in a padlocked and sealed lever box which could only be opened by breaking the seal or by an employee having a key to the padlock."

Plaintiff contends that proof of the physical cause of the accident, or an unsuccessful attempt to prove a specific act of

negligence on the defendants' part, does not destroy or deprive it of the right to rely upon the doctrine. Defendants' argument to the contrary is predicated upon (a) the credible uncontradicted evidence of both parties showed that the failure of the bridge to open was due solely to the loss of the cotter key, and (b) the loss of the cotter key, under the facts of this case, did not clearly indicate negligence and, therefore, the doctrine is not applicable. It is further contended that even if the loss of the cotter key justified an inference of negligence, plaintiff's instruction VII was erroneous and properly refused.

■ The doctrine of res ipsa loquitur has been variously defined by courts and text writers. The definition stated in 20 R.C.L., ¶ 156, page 187, is as follows: " * * * More precisely the doctrine res ipsa loquitur asserts that whenever a thing which produced an injury is shown to have been under the control and management of the defendant, and the occurrence is such as in the ordinary course of events does not happen if due care has been exercised, the fact of injury itself will be deemed to afford sufficient evidence to support a recovery in the absence of any explanation by the defendant tending to show that the injury was not due to his want of care. * * *"

In Sweeney v. Erving, 228 U.S. 233, 240, 33 S.Ct. 416, 418, 57 L.Ed. 815, Ann.Cas. 1914D, 905, it is stated: " * * * res ipsa loquitur means that the facts of the occurrence warrant the inference of negligence, not that they compel such an inference; * * *."

In the instant case, it is plain that the "thing" which caused the alleged injury was the bridge, and that the "occurrence" was the failure of the bridge to rise. A study of the authorities is convincing that the doctrine, in its usual application, creates an inference of general negligence relative to the "occurrence" which it is charged produced the injury. For instance, in Feldman v. Chicago Railway Co., 289 Ill. 25, 35, 124 N.E. 334, 338, 6 A.L.R. 1291 it is stated: " * * * The charges of negligence in these counts were general, and the doctrine of res ipsa loquitur applies. * * *"

The court held the doctrine not applicable to the counts charging specific negligence. The court also states on the same page: " * * * The record contains no evidence explaining the cause of the accident or overcoming the presumption of negligence. * * *"

There are also authorities, relied upon by the plaintiff, to the effect that an unsuccessful attempt to prove the cause of the injury does not preclude the application of the doctrine. Typical of such cases is Pennsylvania Co. v. Clark, 6 Cir., 266 F. 182, 187, where the court stated: " * * * That even an unsuccessful attempt by a plaintiff to prove by direct evidence the precise cause of the accident (plaintiffs here made no such attempt) does not estop him from relying upon the inference of negligence from the accident itself. [Citing many cases]. * * *"

In the instant case, it is to be kept in mind, not only did the plaintiff attempt to prove the precise cause of the failure of the bridge to rise, but succeeded in doing so.

In Bollenbach v. Bloomenthal, 341 Ill. 539, 547, 173 N.E. 670, 671, the court stated: " * * * Presumptions are never indulged in against established facts. They are indulged in only to supply the place of facts. As soon as evidence is produced which is contrary to the presumption which arose before the contrary proof was offered, the presumption vanishes entirely. * * *"

In Wilson v. E. St. Louis & Int. Water Co., 295 Ill.App. 603, 15 N.E.2d 599, the court cited the Bollenbach case and held that when evidence appears disclosing the cause of the accident, the doctrine disappears. In Cassady v. Old Colony Street Ry. Co., 184 Mass. 156, 68 N.E. 10, on page 12, 63 L.R.A. 285, the court stated: " * * * The real cause being shown, there is no occasion to inquire as to what the presumption would have been as to it if it had not been shown. But if, at the close of the evidence, the cause does not clearly appear, or if there is a dispute as to what it is, then it is open to the plaintiff to argue upon the whole evidence, and the jury are justified in relying upon presumptions, unless they are satisfied that the cause has been shown to be inconsistent with it. * * *"

Many other cases could be cited to the effect that where the cause of the occurrence is shown, especially by the plaintiff, the doctrine is not applicable. The authorities are not uniform in this respect, however, and plaintiff relies upon cases which apparently hold to the contrary.

600

Many of such cases involve the relation of passenger and carrier where the latter is chargeable with a high degree of care. Typical of such cases is Gleeson v. Virginia Midland R. Co., 140 U.S. 435, 443, 11 S.Ct. 859, 862, 35 L.Ed. 458, where the court stated: "Since the decisions in Stokes v. Saltonstall, 13 Pet. 181 [10 L.Ed. 115], and [New Jersey] Railroad [& Transp.] Co. v. Pollard, 22 Wall. 341 [22 L.Ed. 877], it has been settled law in this court that the happening of an injurious accident is, in passenger cases, prima facie evidence of negligence on the part of the carrier, and that (the passenger being himself in the exercise of due care) the burden then rests upon the carrier to show that its whole duty was performed, and that the injury was unavoidable by human foresight. * * *"

Another of such cases is Chicago City Ry. Co. v. Carroll, 206 Ill. 318, 323, 68 N.E. 1087, 1089, where the court stated: "* * * Proof that defendant (appellee) was a passenger, the accident, and the injury, make a prima facie case of negligence. * * *"

In that case a passenger was injured by the fall of a trolley-pole. In answer to appellant's argument that there was nothing to show what had caused the trolley-pole to fall, it was pointed out by the court that such proof on the part of the appellee was not necessary. In other words, the opinion indicates that if the cause has been shown, the doctrine would not have been applicable. Other cases applying the doctrine are where the defendant was in charge of a highly dangerous agency such as electricity. Typical of such cases is San Juan Light Co. v. Requena, 224 U.S. 89, 32 S.Ct. 399, 56 L.Ed. 680. We are not persuaded, however, that the application of the doctrine in passenger cases, where a high degree of care is required, or in cases where the defendant is in charge of a highly dangerous agency, affords any support for its application in the instant case. But whether so or not, we are of the view that it can have no application where the specific cause of the occurrence (in this case the failure of the bridge to rise) is proved by the plaintiff.

Plaintiff cites Clement v. Metropolitan West Side El. Ry. Co., 7 Cir., 123 F. 271, an opinion of this court. This case is similar to the instant one in that the cause of the injury was the failure of a bridge to rise. While the doctrine evidently was not relied upon—at any rate it is not mentioned in the opinion—yet the court held the defendant guilty of negligence. The court, however, on page 274 of 123 F., said:

"* * * On the occasion in question the bridge could not be opened; but we are left in the dark with respect to the cause. * * * We are simply informed that the towerman was unable to open the bridge, and the counsel for the respondent below objected successfully to any statement by the towerman—called by the libelant—of the reason that he could not open it or the difficulty with the bridge, and the towerman contents himself with saying that he could not open the bridge himself; leaving the implication either of inability in himself or of some defect which the respondent did not wish disclosed. * * *"

It is reasonable to believe that if the plaintiff in that case, as in the instant one, had proved the cause of the failure of the bridge to rise, a different conclusion would have been reached. Another case relied upon by the plaintiff—Gray v. Baltimore & O. R. R. Co., 7 Cir., 24 F.2d 671, 59 A.L.R. 461—is also an opinion of this court. This was a passenger case, and the evidence showed that the train was derailed because an outsider had sawed the switch lock in two and turned the switch. The court denied the application of the doctrine, and on page 673 of 24 F.2d, stated: "* * * If the negligence is known, there is no justification for the drawing of inferences. In this case, the cause of the open switch was a matter of common knowledge, and was fully known to the plaintiff. * * *"

The plaintiff, however, seeks to distinguish the instant situation by arguing that at most, it only proved that the absence of the cotter key was the physical cause of the failure of the bridge to rise, and not a specific act of negligence, and that, therefore, the doctrine is applicable to this physical cause—that is, the absence of the cotter key—and that, by reason of the doctrine, an inference of negligence is to be indulged with respect thereto. In our view this position is not sound. Such a theory confines the negligence, if any, to an infinitesimal part of the mechanism of the bridge. By plaintiff's proof, the only thing to which negligence could be attributed was definitely fixed, and we think that any negligence in connection therewith must be treated as specific rather

than general. The doctrine, however, raises an inference of general negligence with respect to the instrumentality (the bridge). In the instant case, its application must embrace any and all negligence which might be responsible for the failure of the bridge to rise. We are of the opinion that when a plaintiff, by pleading or proof, eliminates a portion of elements upon which general negligence might be inferred, the reason for the rule fails. To hold otherwise is to permit the indulgence of a false inference—one which could not exist consistently with plaintiff's proof. The inference which the doctrine permits is as to the instrumentality as a whole. We assume, on account of the size and magnitude of defendants' bridge, that there could have been many reasons for the failure of the bridge to operate. In addition to the many mechanical parts which might have afforded the cause, it might have been due to neglect in numerous ways on the part of employees who were charged with the duty of raising and lowering the bridge. Notwithstanding that plaintiff, by its proof, eliminated all causes except the cotter key, it would still indulge in an inference that the failure to raise the bridge might have been occasioned by some or all of the many other reasons concerning which negligence might be inferred.

Furthermore, we are of the view that the circumstances concerning the absence of the cotter key are such as would not justify the creation of a legal inference of negligence. The record discloses that it was defendants' custom to weekly inspect the mechanism of the bridge, and that this was done about one week prior to the time in question. The inspector testified that all operatable parts of the bridge, including the brass pin and cotter key, were in place at that time. This was the first occasion wherein the bridge had failed to operate. It had been raised and lowered about thirty minutes prior to the time of the failure in question. The mechanism for raising and lowering the bridge was of the most approved and modern type.

There was no way of ascertaining how long the cotter key had been out of place. It is argued by the plaintiff that it might have been several days. It is true, some of the witnesses admitted that the brass pin might have remained in place for some time without a cotter key. The brass pin, however, fit loosely and it is not likely it would have long remained in place without a cotter key. It is an almost irresistible conclusion that the cotter key was absent for a very brief period prior to the time in question. We do not understand that plaintiff makes any complaint with reference to the character of the equipment, the manner of its installation, or that it was improperly or not sufficiently inspected. Plaintiff, in its brief, makes this statement:

"* * * The cotter pin may have been missing because of the negligence of the defendants, so it is essential if defendants would exculpate themselves from negligence, for them to show why the cotter pin came out. * * *"

Both plaintiff and the defendants advance numerous theories, none of which is directly supported as to why the cotter key was absent. We agree with the defendants that the most reasonable hypothesis is that it broke, some time subsequent to the last inspection, as a result of some defect not readily ascertainable by the inspector. Among the possibilities advanced by the plaintiff, which it designates as the most reasonable, is that some employee having a key, entered the box after the last inspection, removed the cotter key for some purpose and carelessly failed either (1) to place a new key in the hole in the bronze pin, or (2) after placing a new key in the hole, failed to clinch it.

In addition to the reasons stated heretofore, we think the doctrine is inapplicable where it can be reasonably said that the absence of the cotter key was as consistent with ordinary care as with negligence. The fact is that it is far more reasonable, under the circumstances, to believe that the key was absent because of breakage occasioned by a latent defect, than any of the other possibilities suggested.

In Interstate Circuit v. Le Normand, 5 Cir., 100 F.2d 160, 161, the court stated: "* * * No specific acts of negligence on the part of the defendant were shown and 'where the evidence shows that the accident may have happened as the result of one of two or more causes, and it is not more reasonably probable that it was due to the negligence of the defendant than to any other cause, the rule of res ipsa loquitur does not apply.' Davis v. Castile, Tex.Com.App., 257 S.W. 870, 872. * * *"

In C. & E. I. R. R. Co. v. Reilly, 212 Ill. 506, 510, 72 N.E. 454, 455, 103 Am.St.Rep.

243, the court stated: "* * * The condition can be accounted for as readily on the hypothesis of pure accident and absence of negligence as upon the ground of negligence, and the rule is well settled that negligence cannot be presumed where nothing is done out of the usual course of business, unless that course itself is improper. * * *" See also Chicago Union Trac. Co. v. Giese, 229 Ill. 260, 265, 82 N.E. 232.

■ The proffered instruction by which plaintiff sought to apply the doctrine, so far as here material, states: "* * * and that such failure to open promptly does not happen in the ordinary course of things, if those in charge of the management and operation of the bridge use ordinary care in connection with its inspection and maintenance, this would be prima facie evidence of negligence on the part of the defendants under the circumstances and would justify the jury in so finding, unless upon the whole evidence, such prima facie evidence is rebutted."

From what we have said, it is apparent that this instruction was improper as applied to the facts in this case and was properly denied by the Trial Court. It might have been proper if the failure of the bridge to rise had not been proved by the plaintiff. The instruction illustrates what we have pointed out heretofore, in that the doctrine creates an inference of general negligence applicable to the instrumentality as a whole and not to some particular part thereof. Under the charge as requested, an inference of negligence would have been permitted as to anything which occurred in connection with the "inspection and maintenance" of the bridge. Plaintiff, however, having eliminated all causes for the failure of the bridge to rise, with the exception of the absence of the cotter key, was not entitled to have the jury indulge in an inference of negligence as to some other part of the bridge, or acts of some employee in charge of its management and operation. It is said that the substance of the instruction is taken from Inland & Seaboard Coasting Co. v. Tolson, 139 U.S. 551, 11 S.Ct. 653, 35 L.Ed. 270. Even so, the theory which we have discussed finds further support from the fact that in the Tolson case the charge was directed at the instrumentality as a whole, and not to some minor part thereof, and the inference of negligence thereby created was general and not specific as is sought to be created in the instant matter.

■ It is further argued for reasons entirely apart from res ipsa loquitur, that the requested instruction should have been given under count 8 of the complaint which pleaded a Federal statute. Title 33 U.S. C.A. § 494. The pertinent portion of that enactment requires that the bridge "shall be opened promptly." It is argued that a violation of a statutory duty was charged and proof that the bridge failed to rise "promptly" created a prima facie case in favor of the plaintiff. We are of the view that the statute requires no greater or different care on the part of the defendants than was required at common law. The word "promptly" we think, means the same as "reasonable." There is no liability under the Statute unless there was negligence in a failure to "promptly" raise the bridge. What we have said heretofore concerning the impropriety of the requested instruction under the doctrine of res ipsa loquitur likewise applies to the count of the complaint predicated upon the statutory provision.

■ It is also argued that if the requested instruction on res ipsa loquitur did not properly define the doctrine as applicable to the facts in the case, it was the duty of the court to so modify it as to make it applicable. We do not think it necessary to discuss this contention. The weight of the authority is to the effect that a court is under no independent duty to supply correct instructions where requests are defective. Phoenix Railway Co. v. Landis, 231 U.S. 578, 34 S.Ct. 179, 58 L.Ed. 377; Stewart v. Capital Transit Co., 70 App.D.C. 346, 108 F.2d 1, 3; Mansfield Hardwood Lumber Co. v. Horton, 8 Cir., 32 F.2d 851. We are also convinced that there was no error in the court's charge as to the standard of care required by the defendants. In fact, the charge was as favorable to plaintiff as it could have reasonably expected.

We therefore reach the conclusion that the case was fairly tried and that no error was committed which would justify a reversal.

The judgment is therefore affirmed.